ROBERT JACKSON MILLER, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Miller v. Commissioner
Docket No. 12058-84
United States Tax Court
T.C. Memo 1989-485; 1989 Tax Ct. Memo LEXIS 485; 58 T.C.M. (CCH) 39; T.C.M. (RIA) 89485; September 5, 1989; As corrected September 6, 1989 *485 Held: Amounts of unreported income from fraudulent scheme redetermined. Fraud addition sustained. Robert J. Miller, pro se. James R. Rich, for the respondent. WHITAKER
MEMORANDUM FINDINGS OF FACT AND OPINION WHITAKER, Judge: Respondent determined deficiencies and additions to tax against petitioner for the years and in the amounts as follows: Addition to Tax
Year
Deficiencies
Section [1] 6653(b)
1980
$ 23,728.72
$ 11,864.36
1981
6,098.00
3,049.00
Both the amount of the deficiencies and the existence of fraudulent intent are in issue. The principal *486 adjustment represents respondent's determinations of the amounts of unreported income from petitioner's scheme to defraud his employer. Also in issue is a $ 12,000 worthless stock loss. [2] Respondent conceded a 1981 capital gain adjustment. FINDINGS OF FACT Some of the facts have been stipulated and they are so found. When the amended petition in this case was filed, petitioner was incarcerated in the Federal prison camp at Maxwell Air Force Base, Alabama. At the time that petitioner's incarceration commenced, petitioner was a resident of South Carolina.
Unreported Income
During the 2 years before the Court and prior thereto, petitioner worked as a claims adjuster for Seibels-Bruce Group, Inc. (the Company), a company engaged in the insurance business with offices in Columbia and Greenville, South Carolina, among other places. (In various documents in this record, this company is also referred to as Seibels, Bruce & Company, Seibels, Bruce Group, and the Seibels Bruce *487 Group, Inc. The correct name of the company is not material to this case.) During the years 1979, 1980, and 1981, petitioner was engaged with a number of other individuals, including some of petitioner's superiors, in the Greenville office, in a scheme to defraud the Company by filing inflated and fictitious reports of motor vehicle damage for which one of the Company's insured was responsible. On September 13, 1982, petitioner pleaded guilty in the Greenville, South Carolina, General Sessions Court to 13 counts of breach of trust and two counts of conspiracy involving fraudulent automobile repair claims. Pursuant to a plea agreement entered into with the U.S. Attorney, petitioner pleaded guilty to a two-count Information filed in the United States District Court for the District of South Carolina, Greenville Division, involving two specific instances in which he obtained money by false pretenses. Presumably, petitioner's incarceration at Maxwell Air Force Base was as a result of his guilty plea to the Information. Petitioner has stipulated to having received $ 10,000 in 1980 and $ 2,432 in 1981 through this fraudulent scheme, none of which was reported on petitioner's 1980 *488 and 1981 Federal income tax returns. On September 30, 1983, the Company filed a claim with its insurer, Aetna Casualty and Surety Company (Aetna), with which the Company apparently carried insurance against employee fraud, in the original amount of $ 113,709.46, reduced by the sum of $ 4,966.09 for court ordered restitution by another individual. This claim involved fictitious and inflated claims handled by petitioner during the years 1979 through 1981. The claim was later increased to $ 137,000. The claim was settled by the payment of $ 95,000 less the deductible sum and three items of restitution. Settlement was made in March 1985. In order to determine the amount of the Aetna claim, the Company's representatives first surveyed all the claim department's files handled by petitioner involving $ 1,000 or more in payments. The legitimate claims were separated from those deemed to be fictitious or involving overpayments based upon a deposition given by petitioner, statements made to police, and the guilty pleas of petitioner and those associated with him in this particular scheme. Special attention was given to claims handled by C & D Body Shop. Also claims involving personal *489 injury were excluded since the scheme only involved vehicles with damage. Those files allocated to petitioner's fraudulent scheme were referred to new adjusters who further attempted to isolate inflated and fictitious claims from legitimate claims. As part of their work, the adjusters undertook to locate the insured, the claimants, police department records, and the like. In many instances, the adjusters actually looked at the motor vehicles which were repaired, interrogated the owners as to the nature of the damage, and then tried to assess the amount by which the sums paid exceeded the repair costs of the actual damage. Each of the resulting inflated or fictitious claims was included on a schedule attached to the Company's September 30, 1983, claim submitted to Aetna. The record does not include a breakdown of the increased claim submitted to Aetna. The statutory notice was prepared by one of respondent's agents and is based entirely upon the list of fictitious and inflated claims attached to the Company's claim filed with Aetna in 1983 with essentially three adjustments. The sum of $ 551.42 was eliminated on the basis of the Company's determination that such sum represented *490 a legitimate claim. The agent through an oversight omitted another claim in the amount of $ 573.35. Finally, the agent eliminated all 1979 claims since that year was barred by the running of the statute of limitations. On the schedule attached to the statutory notice, the 1979 items totaled the sum of $ 8,881.13. The total shown on this schedule for 1980 is the sum of $ 81,924.92 and for 1981 the total shown is the sum of $ 23,835.70. Since petitioner had stated in the deposition that the scheme called for him to share the inflated or fictitious proceeds with the body shop which did the repair work on a fifty-fifty basis, the revenue agent reduced the 1980 and 1981 amounts by 50 percent, those sums being treated as unreported income. Thus respondent determined that petitioner received in 1981 the sum of $ 40,962 and in 1981 the sum of $ 11,918. Thus the amounts of unreported income actually in dispute are $ 30,962 for 1980 and $ 9,486 for 1981. Most of the inflated claims were handled by petitioner with C & D Body Shop where the inflated sums were split basically fifty-fifty between the owner of the body shop and petitioner. There is no evidence that any claim involving C *491 & D Body Shop was fictitious. Most of the estimating work and the actual processing of the claims with the motor vehicle owners were handled by an employee in the body shop who apparently received nothing out of the fraudulent scheme although he participated in it. In certain specific instances petitioner received nothing from an inflated claim. For example, a jeep owned by one of petitioner's superiors in the company's Greenville office was repaired without charge but a number of other claims were inflated in order to pay the body shop for the cost of the repair job. There were several other claims for damage to vehicles owned by employees of the body shop which were not inflated or at least if inflated no part of the inflation was paid to petitioner. In one instance the claim may have been inflated in order to paint the entire vehicle rather than just the damaged part. Petitioner handled several fictitious claims with J.B.'s Automotive in Greenville, South Carolina. Thus, a number of the items included in the Company's claim to Aetna were legitimate claims with no inflation or were claims, such as those made to pay for repair of the supervisor's jeep, as to which petitioner *492 received no payment. Approximately one-half of the amounts included in the Company's claim to Aetna for the year 1980 were based on interviews with vehicle owners and drivers, estimating the damage to a vehicle and its repair cost and deducting that sum from the sum actually paid with respect to a vehicle. In 1981 approximately 60 percent of the inflated amounts were determined in that fashion. We find that this method used to determine the amount of the inflation was inaccurate although it may have been the only feasible way of attempting to document the amount of inflation in particular claims. Finally several of petitioner's superiors insisted on being paid a portion of the proceeds received by petitioner from the fraudulent scheme. ULTIMATE FINDINGS OF FACT Using our best judgment, based on the entire record, and resolving doubts against petitioner since he failed to keep any written records as to the details of his fraudulent scheme, the amounts of unreported income received by petitioner in the years 1980 and 1981 were respectively not in excess of the sums of $ 25,500 and $ 6,000. OPINION The first matter for decision in this case is the amount of unreported income *493 received by petitioner in each of the years 1980 and 1981 from his scheme to defraud the Company by padding damage estimates and in a few instances by creating fictitious claims. Petitioner has admitted that he failed to report $ 10,000 in 1980 and $ 2,432 in 1981. Petitioner argues that the determination of unreported income made by the Company for purposes of its claim submitted to Aetna is so inaccurate that it should be ignored. Petitioner also argues that respondent offered no evidence at the trial to substantiate the deficiencies as determined in the statutory notice, but he ignores that the burden of proof is upon him as to the amount of the deficiencies. ; Rule 142(a). We agree with petitioner that the method used by the Company to determine the amount of the inflation in more than half of the claims, by interviewing owners and drivers, inspecting the repaired motor vehicle, and estimating what the cost should have been from the description of damages provided by the vehicle owner or operator, was inaccurate. The evidence on this point is without dispute. Thus, petitioner has shown that the amounts claimed by the *494 Company have many inaccuracies. Further, the evidence establishes that in a number of instances petitioner received no part of the inflated amount and that he was required to pass on to his superiors portions of the illegal sums which he received from payments made to C & D Body Shop and J.B.'s Automotive. We find, however, that petitioner retained substantially more of the illegal funds then he admits to having kept. Using the rule of Cohan ( , we have found that the sums petitioner retained in 1980 and 1981 were not less than $ 25,500 and $ 6,000. See, e.g., , affd. , cert. denied . The issue of fraudulent intent is somewhat more difficult. Under section 6653(b) respondent has the burden of proving fraud by clear and convincing evidence. Sec. 7454(a); Rule 142(b). To meet this burden, respondent must show that the taxpayer intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection *495 of taxes. ; . The existence of fraud is a question of fact to be resolved upon consideration of the entire record. , affd. without published opinion ; . Fraud is not to be imputed or presumed. ; . However, fraud may be proven by circumstantial evidence because direct proof of the taxpayer's intent is rarely available. The taxpayer's entire course of conduct may be examined to establish the requisite fraudulent intent. ; . The intent to conceal or mislead may be inferred from a pattern of conduct. See . A *496 pattern of consistent underreporting of income, especially when accompanied by other circumstances showing an intent to conceal, justifies the inference of fraud. See ; However, the mere failure to report income is not sufficient to establish fraud. . Fraud may not be found under "circumstances which at most create only suspicion." ; . Other badges of fraud which may be taken into account include: the making of false and inconsistent statements to revenue agents, ; the filing of false documents, , affd. ; understatement of income, inadequate records, failure to file tax returns, implausible or inconsistent explanations of behavior, concealment of assets, and failure to cooperate *497 with tax authorities, , affg. a Memorandum Opinion of this Court. The principal badge of fraud on which respondent relies in this case is petitioner's failure to report substantial amounts of income from an illegal activity. Petitioner failed to keep any record of the unreported income, which is also a badge of fraud and on the advice of counsel petitioner failed to cooperate with the examining revenue agent. As we said in McGee, it is a fair inference that a man who will misappropriate another's funds to his own use through misrepresentation and concealment will not hesitate to misrepresent and conceal his receipt of those same funds from the Government with intent to evade tax. [, affd. , cert. denied .] Petitioner's 1980 and 1981 Federal income tax returns were timely filed. On those two returns, petitioner reported wage income of less than $ 16,000 and less than $ 12,000, respectively. The unreported income which we have determined petitioner received in 1980 *498 was thus substantially in excess of the income reported. For 1981 the unreported income was approximately one-half of the income reported. These amounts of additional income were certainly significant. Petitioner knew that the income was taxable. He failed to report the income as part of his understandable effort to conceal from everyone knowledge of the illegal scheme. Petitioner on brief simply argues that taxes were never thought of and that income is not generally assumed to include money obtained by illegal means. Petitioner's arguments are unconvincing. Respondent has established petitioner's fraudulent intent by clear and convincing evidence. Accordingly, we will hold for respondent on the addition to tax under section 6653(b). Decision be entered upon disposition of reserved issue.
Footnotes
1. Unless otherwise noted, all section references are to the Internal Revenue Code of 1954, as amended and in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. The worthless stock loss issue should have been but was not fully documented in a supplemental stipulation filed after the trial. Therefore, that issue is reserved for subsequent disposition.↩